## PONTE, SUPERINTENDENT, MASSACHUSETTS CORRECTIONAL INSTITUTION *v.* REAL

No. 83–1329.   Argued January 9, 1985—Decided May 20, 1985

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined, and in all but the second paragraph of footnote 2 of which BLACKMUN and STEVENS, JJ., joined. STEVENS, J., filed an opinion concurring in part, in Part II of which

BLACKMUN, J., joined, *post*, p. 501. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 504. POWELL, J., took no part in the consideration or decision of the case.

*Martin E. Levin*, Assistant Attorney General of Massachusetts, argued the cause *pro hac vice* for petitioner. With him on the briefs were *Francis X. Bellotti*, Attorney General, and *Barbara A. H. Smith*, Assistant Attorney General.

*Jonathan Shapiro* argued the cause and filed a brief for respondent.

JUSTICE REHNQUIST delivered the opinion of the Court.

The Supreme Judicial Court of Massachusetts held that a prison disciplinary hearing which forfeited "good time" credits of respondent John Real was conducted in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution because there did not appear in the administrative record of that hearing a statement of reasons as to why the disciplinary board refused to allow respondent to call witnesses whom he had requested. *Real v. Superintendent, Massachusetts Correctional Institution, Walpole*, 390 Mass. 399, 456 N. E. 2d 1111 (1983). We granted certiorari, 469 U. S. 814 (1984), to review this judgment because it seemed to us to go further than our pronouncement on this subject in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974). While we agree with the Supreme Judicial Court of Massachusetts that the Due Process Clause of the Fourteenth Amendment requires that prison officials at some point state their reason for refusing to call witnesses requested by an inmate at a disciplinary hearing, we disagree with that court that such reasons or support for reasons must be placed in writing or otherwise exist as a part of the administrative record at the disciplinary hearing. We vacate the judgment of the Supreme Judicial Court, and remand the case to that court.

In 1981 respondent John Real was an inmate at the Massachusetts Correctional Institution at Walpole. In December

of that year he was working in the prison metal shop and heard a commotion in an adjacent office. He entered the office and observed another prisoner fighting with a corrections officer. A second corrections officer attempted to break up the fight, and ordered respondent and other inmates who were watching to disperse immediately. Respondent did not depart, and another corrections officer escorted him to his cell.

One week later respondent was charged with three violations of prison regulations as a result of this imbroglio. He notified prison officials, on a form provided for that purpose, that he wished to call four witnesses at the hearing which would be held upon these charges: two fellow inmates, the charging officer, and the officer who was involved in the fight. A hearing was held on the charges in February 1982. At this hearing the charging officer appeared and testified against respondent, but the board declined to call the other witnesses requested by respondent. Respondent was advised of no reason for the denial of his request to call the other witnesses, and apparently whatever record there may be of this disciplinary proceeding does not indicate the board's reason for declining to call the witnesses. The board found respondent guilty as charged, and after an administrative appeal in which penalties were reduced, respondent received the sanction of 25 days in isolation and the loss of 150 days of good-time credits.

Respondent challenged these sanctions by seeking a writ of habeas corpus in the Massachusetts trial court. That court sustained respondent's claim that petitioner Joseph Ponte, a Superintendent of the M. C. I. at Walpole, had deprived him of that due process guaranteed by the Fourteenth Amendment to the United States Constitution because no reasons whatsoever were advanced by petitioner in court as to why respondent was not allowed to call the requested witnesses at the hearing.

On appeal to the Supreme Judicial Court of Massachusetts, this judgment was affirmed but for different reasons. That court discussed our decision in *Wolff* v. *McDonnell, supra,* and noted that it "[l]eft unresolved . . . the question whether the Federal due process requirements impose a duty on the board to explain, in any fashion, at the hearing or later, why witnesses were not allowed to testify." 390 Mass., at 405, 456 N. E. 2d, at 1115. The court concluded that there must be some support in the "administrative record" to justify a decision not to call witnesses, and that the administrative record in this case was barren of any such support. Because of its conclusion, the court declared that the Massachusetts regulations governing the presentation of proof in disciplinary hearings, Mass. Admin. Code, Tit. 103, § 430.14 (1978)[1] were unconstitutional as to this point, because those regulations did not require that the administrative record contain

---

[1] Massachusetts Admin. Code, Tit. 103, § 430.14 (1978), provides in part:

"(4) If the inmate requests the presence of the reporting officer . . . the reporting officer shall attend the hearing except when the chairman determines in writing that the reporting officer is unavailable for prolonged period of time *[sic]* as a result of illness or other good cause. . . .

"(5) The inmate shall be allowed but shall not be compelled to make an oral statement or to present a written statement in his own defense or in mitigation of punishment.

"(6) The inmate shall be allowed to question the reporting officer, to question other witnesses, to call witnesses in his defense, or to present other evidence, when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. The factors that the chairman may consider when ruling on an inmate's questioning of witnesses, offer of other evidence, or request to call witnesses shall include, but shall not be limited to, the following:

"(a) Relevance
"(b) Cumulative testimony
"(c) Necessity
"(d) Hazards presented by an individual case.

    .          .          .          .          .

"(7) the inmate shall be allowed to present relevant, non-cumulative documentary evidence in his defense."

facts or reasons supporting the board's denial of an inmate's witness request. 390 Mass., at 405–407, 456 N. E. 2d, at 1116, citing *Hayes* v. *Thompson,* 637 F. 2d 483, 487–489 (CA7 1980).

Petitioner does not dispute that respondent possessed a "liberty" interest, by reason of the provisions of Massachusetts state law, affording him "good time" credits, an interest which could not be taken from him in a prison disciplinary hearing without the minimal safeguards afforded by the Due Process Clause of the Fourteenth Amendment. The touchstone of due process is freedom from arbitrary governmental action, *Wolff,* 418 U. S., at 558, but "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.,* at 556. Chief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board. We noted in *Wolff* and repeated in *Baxter* v. *Palmigiano,* 425 U. S. 308 (1976), that ordinarily the right to present evidence is basic to a fair hearing, but the inmate's right to present witnesses is necessarily circumscribed by the penological need to provide swift discipline in individual cases. This right is additionally circumscribed by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff. We described the right to call witnesses as subject to the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution . . . ." *Baxter, supra,* at 321, citing *Wolff, supra,* at 556.

Thus the prisoner's right to call witnesses and present evidence in disciplinary hearings could be denied if granting the request would be "unduly hazardous to institutional safety or correctional goals." *Wolff, supra,* at 566; *Baxter, supra,* at 321. See also *Hughes* v. *Rowe,* 449 U. S. 5, 9, and n. 6 (1980). As we stated in *Wolff:*

> "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the [disciplinary board] to state its reasons for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." 418 U. S., at 566.

See *Baxter, supra,* at 321. Notwithstanding our suggestion that the board give reasons for denying an inmate's witness request, nowhere in *Wolff* or *Baxter* did we require the disciplinary board to explain why it denied the prisoner's request, nor did we require that those reasons otherwise appear in the administrative record.

Eleven years of experience since our decision in *Wolff* does not indicate to us any need to now "prescribe" as constitutional doctrine that the disciplinary board must state in writing at the time of the hearing its reasons for refusing to call a witness. Nor can we conclude that the Due Process Clause of the Fourteenth Amendment may only be satisfied if the administrative record contains support or reasons for the board's refusal. We therefore disagree with the reasoning of the Supreme Judicial Court of Massachusetts in this case. But we also disagree with petitioner's intimation, Brief for Petitioner 53, that courts may only inquire into the reasons for denying witnesses when an inmate points to "substantial evidence" in the record that shows prison officials had ignored our requirements set forth in *Wolff.* We further disagree with petitioner's contention that an inmate may not successfully challenge the board unless he can show a pattern or practice of refusing all witness requests. Nor do we agree with petitioner that "across-the-board" policies denying witness requests are invariably proper. Brief for Petitioner 53–55, n. 9.

The question is exactly that posed by the Supreme Judicial Court in its opinion: "whether the Federal due process requirements impose a duty on the board to explain, in any fashion, at the hearing or later, why witnesses were not allowed to testify." 390 Mass., at 405, 456 N. E. 2d, at 1115. We think the answer to that question is that prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but that they may do so either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it "later." Explaining the decision at the hearing will of course not immunize prison officials from a subsequent court challenge to their decision, but so long as the reasons are logically related to preventing undue hazards to "institutional safety or correctional goals," the explanation should meet the due process requirements as outlined in *Wolff*.

We have noted in *Wolff*, *supra*, and in *Baxter*, *supra*, that prison disciplinary hearings take place in tightly controlled environments peopled by those who have been unable to conduct themselves properly in a free society. Many of these persons have scant regard for property, life, or rules of order, *Wolff*, 418 U. S., at 561–562, and some might attempt to exploit the disciplinary process for their own ends. *Id.*, at 563. The requirement that contemporaneous reasons for denying witnesses and evidence be given admittedly has some appeal, and it may commend itself to prison officials as a matter of choice: recollections of the event will be fresher at the moment, and it seems a more lawyerlike way to do things.[2]

---

[2] JUSTICE MARSHALL's dissent maintains that a rule requiring contemporaneous reasons which are not made available to the prisoner is the only one permitted by the United States Constitution. If indeed this rule is as beneficial to all concerned as the dissent claims, we may eventually see it

But the primary business of prisons is the supervision of inmates, and it may well be that those charged with this responsibility feel that the additional administrative burdens which would be occasioned by such a requirement detract from the ability to perform the principal mission of the institution. While some might see an advantage in building up a sort of "common law of the prison" on this subject, others might prefer to deal with later court challenges on a case-by-case basis. We hold that the Constitution permits either approach.

But to hold that the Due Process Clause confers a circumscribed right on the inmate to call witnesses at a disciplinary hearing, and then conclude that no explanation need ever be vouched for the denial of that right, either in the disciplinary proceeding itself or if that proceeding be later challenged in court, would change an admittedly circumscribed right into a privilege conferred in the unreviewable discretion of the disciplinary board. We think our holding in *Wolff* meant

---

universally adopted without the necessity of constitutionally commanding it. But we think that, as we indicate in this opinion, there are significant arguments in favor of allowing a State to follow *either* the approach advocated by the dissent or the approach described in this opinion. While the dissent seems to criticize our alternative as one which forces inmates to go to court to learn the basis for witness denials, it is difficult if not impossible to see how inmates under the dissent's approach which requires contemporaneous reasons kept under seal would be able to get these reasons without the same sort of court proceeding.

We think the dissent's approach would very likely lead to an increasing need for lawyers attached to each prison in order to advise the correctional officials; words such as "irrelevant" or "cumulative," offered by the dissent as possible bases for contemporary denials, *post*, at 517, are essentially lawyer's words. We think that the process of preparing contemporary written reasons for exclusion of testimony is very likely to require more formality and structure than a practice which requires bringing in an attorney only when a lawsuit is filed. The former may be ideally suited to a heavily populated State of relatively small area such as Massachusetts, but the latter may be more desirable in a sparsely populated State of large area such as Nevada. We think the Constitution permits either alternative.

something more than that. We recognized there that the right to call witnesses was a limited one, available to the inmate "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.*, at 566. We further observed that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Ibid.*

Given these significant limitations on an inmate's right to call witnesses, and given our further observation in *Wolff* that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators," *ibid.*, it may be that a constitutional challenge to a disciplinary hearing such as respondent's in this case will rarely, if ever, be successful. But the fact that success may be rare in such actions does not warrant adoption of petitioner's position, which would in effect place the burden of proof on the inmate to show why the action of the prison officials in refusing to call witnesses was arbitrary or capricious. These reasons are almost by definition not available to the inmate; given the sort of prison conditions that may exist, there may be a sound basis for refusing to tell the inmate what the reasons for denying his witness request are.

Indeed, if prison security or similar paramount interests appear to require it, a court should allow at least in the first instance a prison official's justification for refusal to call witnesses to be presented to the court *in camera*. But there is no reason for going further, and adding another weight to an already heavily weighted scale by requiring an inmate to produce evidence of which he will rarely be in possession, and of which the superintendent will almost always be in possession. See *United States* v. *New York, N. H. & H. R. Co.*, 355 U. S. 253, 256, n. 5 (1957); *Campbell* v. *United States*,

365 U. S. 85, 96 (1961); *South Carolina* v. *Katzenbach*, 383 U. S. 301, 332 (1966).

Respondent contends that he is entitled to an affirmance even though we reject the Massachusetts Supreme Judicial Court's holding that § 340.14(6) is unconstitutional. Respondent argues that the Supreme Judicial Court affirmed the trial court on two independent grounds: (1) the trial court's simple finding that petitioner's failure to rebut the allegations in respondent's complaint entitled respondent to relief; and (2) the unconstitutionality of § 340.14(6) because due process requires administrative record support for denial of witnesses. We think that the Supreme Judicial Court affirmed only on the second ground, and that is the issue for which we granted certiorari. This Court's Rule 21.1(a); see also Rule 15.1(a). Respondent is of course entitled to urge affirmance of the judgment of the Supreme Judicial Court on a ground not adopted by that court, but whether the Supreme Judicial Court would have affirmed the judgment of the trial court on the reasoning we set forth today is, we think, too problematical for us to decide.[3] It is a question best left to that court.

The judgment of the Supreme Judicial Court of Massachusetts is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

---

[3] The record in this case is exceedingly thin, and shows that some confusion existed at trial concerning respondent's habeas petition seeking review of the February 1982 disciplinary hearing and another unrelated petition arising out of a 1980 disciplinary hearing. The trial court also apparently granted incomplete relief, which was only corrected 10 months later by another judge who then stayed the relief. Moreover, the Supreme Judicial Court did not just affirm the trial court, but remanded to permit petitioner, at his option, to conduct another disciplinary hearing. Given the state of this record, we think it wise to remand for further proceedings.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins as to Part II, concurring in part.

On March 10, 1983, this case was submitted to the Supreme Judicial Court of Massachusetts along with four others.[1]  In each case, prisoners in state correctional institutions challenged the procedural fairness of recurring practices in the prison disciplinary process.  The five opinions were all assigned to the same justice, who eight months later delivered five unanimous opinions for the court interpreting the minimum procedural requirements of state regulations and the Federal Constitution in the prison context.  The evident deliberation of the Massachusetts court in these cases suggests a careful effort to establish workable rules for prison disciplinary proceedings in that State.

I

The Court candidly states that it granted certiorari to review the judgment of the Supreme Judicial Court of Massachusetts because that judgment "seem[s] to us to go further than our pronouncement on this subject in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974)." *Ante*, at 492.  As JUSTICE MARSHALL points out, that is a manifestly insufficient reason for adding this case to our argument docket.  See *post*, at 522–523, n. 21.  The merits of an isolated case have only an oblique relevance to the question whether a grant of

---

[1]*Nelson* v. *Commissioner of Correction*, 390 Mass. 379, 456 N. E. 2d 1100 (1983); *Real* v. *Superintendent, Massachusetts Correctional Institution, Walpole*, 390 Mass. 399, 456 N. E. 2d 1111 (1983) (case below); *Lamoureux* v. *Superintendent, Massachusetts Correctional Institution, Walpole*, 390 Mass. 409, 456 N. E. 2d 1117 (1983); *Cassesso* v. *Commissioner of Correction*, 390 Mass. 419, 456 N. E. 2d 1123 (1983); *Royce* v. *Commissioner of Correction*, 390 Mass. 425, 456 N. E. 2d 1127 (1983). The court did not reach the constitutional questions presented in *Royce* since it resolved the controversy in favor of the prisoner on the basis of state regulations.

certiorari is consistent with the sound administration of this Court's discretionary docket.[2]

When the prison Superintendent petitioned for certiorari, he had a heavy burden of explaining why this Court should intervene in what amounts to a controversy between the Supreme Judicial Court of Massachusetts and that State's prison officials.[3] In determining what process is due in the prison context under the Federal Constitution, the Court emphasizes that we must be cautious to ensure that those requirements will be fair to all parties in the varying conditions found in each of the 50 States and the District of Columbia. *Ante*, at 497–498, n. 2. The Court's display of caution would have been more relevant in deciding whether to exercise discretionary jurisdiction in the first place. The denial of certiorari would have left the decision below in effect for the State of Massachusetts, but would have left other jurisdictions to explore the contours of *Wolff*, in the light of local conditions.

---

[2] Cf. *Watt* v. *Alaska*, 451 U. S. 259, 276 (1981) (STEVENS, J., concurring) ("My disagreement in these cases with the Court's management of its docket does not, of course, prevent me from joining [the Court's opinion] on the merits"); *Revere* v. *Massachusetts General Hospital*, 463 U. S. 239, 246–247 (1983) (STEVENS, J., concurring in judgment).

[3] "Because the Supreme Judicial Court of Massachusetts—rather than another branch of state government—invoked the Federal Constitution in imposing an expense on the City of Revere, this Court has the authority to review the decision. But is it a sensible exercise of discretion to wield that authority? I think not. There is 'nothing in the Federal Constitution that prohibits a State from giving lawmaking power to its courts.' *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 479 (1981) (STEVENS, J., dissenting). No individual right was violated in this case. The underlying issue of federal law has never before been deemed an issue of national significance. Since, however, the Court did (unwisely in my opinion) grant certiorari, I join its judgment." *Revere* v. *Massachusetts General Hospital*, 463 U. S., at 247 (STEVENS, J., concurring in judgment) (footnote omitted). See also *Michigan* v. *Long*, 463 U. S. 1032, 1067–1068 (1983) (STEVENS, J., dissenting); *post*, at 522–523, n. 21 (MARSHALL, J., dissenting).

The imprudence of the Court's decision to grant certiorari in this case is aggravated by the substantial probability that the Massachusetts court will, on remand, reinstate its original judgment on the basis of the State Constitution.[4]   In that event, the Court's decision—as applied to the State of Massachusetts—will prove to be little more than a futile attempt to convince a State Supreme Court that a decision it has carefully made is somehow lacking in wisdom as applied to conditions in that State.   "As long as the Court creates unnecessary work for itself in this manner, its expressions of concern about the overburdened federal judiciary will ring with a hollow echo."  *Watt* v. *Alaska*, 451 U. S. 259, 274 (1981) (STEVENS, J., concurring).

## II

Having granted the petition for certiorari, however, each of us has a duty to address the merits.   All of us agree that prison officials may not arbitrarily refuse to call witnesses requested by an inmate at a disciplinary hearing.   It is

---

[4] In a series of recent cases, this Court has reversed a state-court decision grounded on a provision in the Federal Bill of Rights only to have the state court reinstate its judgment, on remand, under a comparable guarantee contained in the State Constitution.  See, *e. g.*, *Massachusetts* v. *Upton*, 466 U. S. 727 (1984), on remand, *Commonwealth* v. *Upton*, 394 Mass. 363, 370–373, 476 N. E. 2d 548, 554–556 (1985); *California* v. *Ramos*, 463 U. S. 992 (1983), on remand, *People* v. *Ramos*, 37 Cal. 3d 136, 150–159, 689 P. 2d 430, 437–444 (1984), cert. denied, *post*, p. 1119; *South Dakota* v. *Neville*, 459 U. S. 553 (1983), on remand, *State* v. *Neville*, 346 N. W. 2d 425, 427–429 (SD 1984); *Washington* v. *Chrisman*, 455 U. S. 1 (1982), on remand, *State* v. *Chrisman*, 100 Wash. 2d 814, 817–822, 676 P. 2d 419, 422–424 (1984) (en banc).   This development supports Justice Jackson's observation that "reversal by a higher court is not proof that justice is thereby better done.   There is no doubt that if there were a super Supreme Court, a substantial proportion of our reversals of state courts would also be reversed.   We are not final because we are infallible, but we are infallible only because we are final."  *Brown* v. *Allen*, 344 U. S. 443, 540 (1953) (concurring in result).

therefore obvious that even if the reason for the refusal is not recorded contemporaneously, it must exist at the time the decision is made.

Moreover, as the Court expressly holds, *ante*, at 499, the burden of proving that there was a valid reason for the refusal is placed on prison officials rather than the inmate. In many cases, that burden will be difficult to discharge if corrections officers elect to rely solely upon testimonial recollection that is uncorroborated by any contemporaneous documentation. For that reason, the allocation of the burden of proof, together with the policy considerations summarized by JUSTICE MARSHALL, will surely motivate most, if not all, prison administrators to adopt "the prevailing practice in federal prisons and in state prisons throughout the country." *Post*, at 518 (MARSHALL, J., dissenting). Because I am not persuaded that the Federal Constitution prescribes a contemporaneous written explanation as the only permissible method of discharging the prison officials' burden of proving that they had a legitimate reason for refusing to call witnesses requested by an inmate, I join the Court's opinion.[5]

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The court below held there must be "some support in the record" for the denial of an inmate's right to call witnesses at a prison disciplinary hearing. Rejecting this position, the Court today concludes that the Constitution requires only that prison officials explain in court, many months or years after a disciplinary hearing, why they refused to hear particular witnesses. I cannot accept that alleged denials of the vital constitutional right to present witnesses are to be reviewed, not on the basis of an administrative record, but rather on the basis of *post hoc* courtroom rationalizations. I believe the Constitution requires that a contemporaneous-record explanation for such a denial be prepared at the time

---

[5] I do not, however, agree with the second paragraph in n. 2, *ante*, at 498.

of the hearing. The record need not be disclosed to the inmate but would be available to a court should judicial review later be sought. Upon a proper showing that security or other needs of prison officials so require, the court could review the contemporaneous-record explanation *in camera.* That this process is compatible with the prison setting is demonstrated by the fact that the recording of contemporaneous reasons for denying requests to call witnesses is the current practice in federal prisons and in most state prisons in this country.

## I

The facts of this case, which the Court declines to relate in full, highlight the importance of the right to call witnesses at disciplinary hearings. As the Court describes, respondent John Real was among a group of inmates who left the prison metal shop to observe a fight between an inmate and guard that had broken out in an adjacent office. A supervising officer, John Baleyko, ordered Real and the others to leave the area. The Court blandly observes that Real "did not depart." *Ante,* at 493. Real's version of the events, however, is considerably more detailed. According to Real, as he began to leave, a dozen or so correctional officers entered the office, one of whom, Officer Doolin, stopped Real for a brief shakedown search and questioning. Officer Baleyko then looked up and noticed that Real was still in the office despite the order to leave. When Real tried to explain that he had been unable to leave because he had been stopped by the other officer, Officer Baleyko cut short Real's explanation and ordered him locked up. On its face, Real's explanation for his failure to obey the order to leave is perfectly plausible, internally consistent, and does not contradict any of the undisputed facts.

Real's disciplinary hearing, then, involved a classic swearing match: Officer Baleyko offered one version of the facts, and Real countered with another version. Under these circumstances, testimony from observers of the incident would

seem highly relevant to, and perhaps even dispositive of, the question of Real's responsibility for his failure to obey the order to leave. Real therefore requested that three witnesses be produced for the disciplinary hearing: two inmates who had allegedly been present in the metal shop at the time of the incident and a correctional officer.[1] The disciplinary board, composed of three correctional officials, refused to hear any of these witnesses. No reason for excluding this seemingly highly relevant testimony was given at the time. No reason can be deciphered from the record, and indeed no explanation has ever been offered for the refusal to hear these witnesses. Real was found guilty and eventually was deprived of 150 days of good-time credit—a near 5-month prison term on a charged offense against which his only opportunity to defend was to offer his word against that of a prison guard.

## II

The Court acknowledges that Real had a constitutional right to present his defense witnesses unless his disciplinary board had a legitimate basis for excluding them. This much is clear from *Wolff* v. *McDonnell*, 418 U. S. 539 (1974). Drawing on longstanding principles of due process embodied in the Fifth, Sixth, and Fourteenth Amendments,[2] the Court in *Wolff* recognized what might be called a "qualified" constitutional right to call witnesses:

> "[T]he inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.*, at 566.

See also *Baxter* v. *Palmigiano*, 425 U. S. 308, 321 (1976). This qualified right was one element in what the Court

---

[1] Real appears not to have pursued in the lower courts the failure to produce the correctional officer.

[2] See n. 7, *infra.*

described as an overall effort to create a "reasonable" and "mutual accommodation" between the "provisions of the Constitution" and "the needs of the institution" in the context of disciplinary hearings. 418 U. S., at 556, 572.

*Wolff* did not consider how best to strike that reasonable accommodation with respect to implementing the right to call witnesses.[3] Two options are presented today. The first would require disciplinary boards to enter on the record contemporaneous written reasons for their exclusion of witnesses; these explanations, while not necessarily available to the inmate, would be subject to judicial review to assure that exclusion of witnesses was not arbitrary but rather was based on permissible factors. The second option would only require disciplinary boards to offer *post hoc*, courtroom rationalizations for a board's refusal to hear requested witnesses; these rationalizations would constitute attempts to justify the board's actions, many months, or years, after a witness had been excluded.

Inexplicably, the Court, with only passing consideration of the first option, chooses the second. But no basis for this choice can be found in the principle of "mutual accommodation" announced in *Wolff*. If *Wolff*'s principle of mutual accommodation means, as the State contends, that an inmate "is entitled only to those facets of procedural due process which are consistent with the demands of prison security,"[4] it surely also means that the inmate is entitled to *all* the facets of due process that are consistent with the demands of prison security. Contemporaneous explanations for excluding witnesses are an important element of due process at disciplinary hearings and, as long as prison officials have the option of keeping these explanations from the inmate, a requirement that such explanations be recorded would not

---

[3] *Wolff* did eliminate one possibility: that the Constitution might require disclosure to the inmate, at the time of the hearing, of a board's reasons for refusing to allow requested witnesses to be called. 418 U. S., at 566.

[4] Brief for Petitioner 13–14.

intrude on the "institutional needs and objectives" of prisons that *Wolff* identified. In the face of this readily available means of enforcing the inmate's right, the Court's decision instead to choose the second option, that of after-the-fact courtroom explanations, gratuitously dilutes the constitutional rights of prison inmates and fulfills my previously expressed fear that the "noble holdings" of *Wolff* would become "little more than empty promises." *Wolff, supra,* at 581 (opinion of MARSHALL, J.). I therefore dissent.

## III

A contemporaneous-explanation requirement would strike the proper balance between the inmate's right to present defense witnesses and the institutional needs recognized in *Wolff.* As a general matter, it is now well understood that contemporaneous-explanation requirements serve two important functions. First, they promote a decisionmaking process in which the decisionmaker must consciously focus on the relevant statutory criteria of decision.[5] Knowledge that a decision will be tested against the justifications contemporaneously given for it increases the prospect that fair and nonarbitrary decisions will be made initially.

Second, judicial review is most meaningful when based on a record compiled before litigation began. *Post hoc* rationalizations of counsel for administrative action "have traditionally been found to be an inadequate basis for review." *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 419 (1971):

> "[A]n advocate's hypothesis that an administrative decision-maker *did in fact* conclude thus-and-such because

---

[5] See, *e. g., Goldberg* v. *Kelly,* 397 U. S. 254, 271 (1970); see also *Dorszynski* v. *United States,* 418 U. S. 424, 455 (1974) (MARSHALL, J., concurring in judgment); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 40 (1979) (MARSHALL, J., dissenting); *Hewitt* v. *Helms,* 459 U. S. 460, 479 (1983) (STEVENS, J., dissenting); *Connecticut Bd. of Pardons* v. *Dumschat,* 452 U. S. 458, 468 (1981) (STEVENS, J., dissenting).

the record shows that he *could reasonably have concluded* thus-and-such, is not likely to be highly impressive. The courts prefer to appraise the validity of an order by examining the grounds *shown by the record* to have been the basis of decision." W. Gellhorn, C. Byse, & P. Strauss, Administrative Law 361 (7th ed., 1979).

Indeed, even when decisionmakers themselves have been willing to submit affidavits to explain with hindsight the basis of their previous decisions, we have refused to consider such offers of proof for fear that they serve as merely *"post hoc* rationalizations." *Burlington Truck Lines* v. *United States*, 371 U. S. 156, 168–169 (1962). The best evidence of why a decision was made as it was is usually an explanation, however brief, rendered *at the time of the decision.*

The considerations that call for contemporaneous-explanation requirements in some contexts apply with particular force in the setting of prison disciplinary hearings. A contemporaneous-explanation requirement would force boards to take the inmate's constitutional right to present witnesses seriously. And when inmates are allowed to call witnesses, the fairness and accuracy of disciplinary board findings are significantly affected, not only because witnesses are often crucial to the presentation of a defense,[6] but particularly because an inmate "obviously faces a severe credibility problem when trying to disprove the charges of a prison

---

[6] "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers* v. *Mississippi*, 410 U. S. 284, 302 (1973). As the Court said in *Washington* v. *Texas*, 388 U. S. 14, 19 (1967):

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [factfinder] so it may decide where the truth lies. . . . This right is a fundamental element of due process of law."

See also *United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 875 (1982) (O'CONNOR, J., concurring) ("[T]he right to compulsory process is essential to a fair trial"); *In re Oliver*, 333 U. S. 257, 273 (1948).

guard." 418 U. S., at 583 (opinion of MARSHALL, J.). Many of the other procedural due process rights recognized in *Wolff*—for example, the right to advance notice of the charges, to a hearing, and to a statement of evidence and reasoning relied on—make sense only if the inmate is allowed to present his or her version of the facts through witnesses and evidence. Apart from such witnesses and evidence, inmates have little else with which to attempt to prove their case or disprove that of the charging officer; they have no constitutional right to confront and cross-examine adverse witnesses, and counsel is typically not present at these hearings to marshal the inmate's case. *Wolff*, 418 U. S., at 568; see also *Baxter*, 425 U. S., at 321–322. That so much hinges on the right to present witnesses is a particularly compelling reason for assuring, through a requirement of written reasons when witnesses are excluded, that the right is being scrupulously honored. See *Connecticut Bd. of Pardons* v. *Dumschat*, 452 U. S. 458, 472 (1981) (STEVENS, J., dissenting);[7] cf. *Harris* v. *Rivera*, 454 U. S. 339, 344–345, n. 11 (1981) *(per curiam)* ("[W]hen other procedural safeguards have minimized the risk of unfairness, there is a diminished justification for requiring a judge to explain his rulings").

Moreover, *post hoc* rationalizations are unlikely to be of any practical use in this context. Board officials may well not remember, long after the fact, the actual reasons they refused to hear a particular witness in any given case.[8] As

---

[7] "Whether the refusal to provide the inmates with a statement of reasons is a procedural shortcoming of constitutional magnitude is, admittedly, fairly debatable. Judges often decide difficult and important cases without explaining their reasons, and I would not suggest that they thereby commit constitutional error. But the ordinary litigant has other substantial procedural safeguards against arbitrary decisionmaking in the courtroom. The prison inmate has few such protections. . . . Many of us believe that . . . statements of reasons provid[e] a better guarantee of justice than could possibly have been described in a code written in sufficient detail to be fit for Napoleon." 452 U. S., at 472.

[8] In 1980, Massachusetts correctional institutions conducted 6,914 disciplinary hearings. Brief for Petitioner 63, n. 12.

one Court of Appeals has concluded, "[t]he requirement of support in the administrative record is central to the effectiveness of judicial review in insuring that a prisoner has not been subjected to arbitrary action by prison officials." *Hayes* v. *Thompson*, 637 F. 2d 483, 488 (CA7 1980).

These very reasons have led the Court to impose a contemporaneous-explanation requirement when virtually identical procedural rights, guaranteed by the Constitution, were at stake.[9] *Vitek* v. *Jones*, 445 U. S. 480 (1980), is an example directly on point. There the Court held that an inmate being considered for transfer to a mental institution has a constitutional right to a pretransfer hearing and to present witnesses at that hearing. To this point, *Vitek* is on all fours with this case; inmates in both proceedings have a right to a hearing and to witnesses. Yet in *Vitek* the Court further recognized that witnesses could not be excluded except upon a legitimate record finding of good cause—the very requirement the Court today chooses not to extend to disciplinary hearings.[10] Similarly, *Gagnon* v. *Scarpelli*, 411 U. S. 778

---

[9] Even the Court acknowledges that a requirement of contemporaneous reasons "admittedly has some appeal . . . : recollections of the event will be fresher at the moment, and it seems a more lawyerlike way to do things." *Ante*, at 497. Of course, the essence of procedural due process is that institutions adopt "lawyerlike" procedures to assure that decisions are fair, rational, and carefully made.

[10] The Court in *Vitek* stated that the right to call witnesses could not be denied " 'except upon a finding, *not arbitrarily made*, of good cause for not permitting such presentation . . . .' " 445 U. S., at 494–495 (quoting court below, *Miller* v. *Vitek*, 437 F. Supp. 569, 575 (Neb. 1977)) (emphasis added).

The importance of record explanations for excluding witnesses from disciplinary hearings is probably even greater than in *Vitek*, for there the key witness against an inmate was a neutral physician or psychologist, 445 U. S., at 483. A prison guard, who both charges an inmate and is the main witness against him, is significantly more likely to have his own personal reasons, including vindictive or retaliatory ones, for wanting to see the inmate convicted. If contemporaneous explanations for excluding witnesses were required in *Vitek*, surely due process requires similar explanations here.

(1973), recognized a due process right to counsel under some circumstances at parole and probation revocation hearings. To assure that this important right was faithfully honored, we further held that "[i]n every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record." *Id.*, at 791. See also *North Carolina* v. *Pearce*, 395 U. S. 711, 726 (1969) (written reasons required when more severe sentence imposed on defendant after second trial); *Gagnon, supra* (written reasons required for probation revocation); *Morrissey* v. *Brewer*, 408 U. S. 471, 489 (1972) (same for parole revocation decisions); *Goldberg* v. *Kelly*, 397 U. S. 254, 271 (1970) (written reasons for termination of public assistance payments); *Kent* v. *United States*, 383 U. S. 541, 561 (1966) (written reason required when juvenile court waives jurisdiction, subjecting defendant to trial as adult).

Ignoring these precedents, the Court seems to view the question simply as one of policy; the Court is content that "significant arguments" can be made in favor either of its "approach" or of the result I believe is required. The question, however, is not whether sound penological practice favors one result or the other, but rather what minimal elements of fair process are required in this setting to satisfy the Constitution. Due process requires written reasons for decisions, or for steps in the decisionmaking process, when the individual interest at stake makes the contribution of such reasons to the fairness and reliability of the hearing sufficient to outweigh whatever burdens such a requirement would impose on the government. See *Black* v. *Romano, post,* at 617–619 (MARSHALL, J., concurring) (collecting cases); see generally *Mathews* v. *Eldridge*, 424 U. S. 319, 335, 343 (1976).

Applying this principle here, there can be little doubt that due process requires disciplinary boards to provide written reasons for refusing to hear witnesses. The liberty interests at stake in these hearings are, of course, of serious magni-

tude, and the right to call witnesses is integral to assuring the fairness and accuracy of these hearings. Moreover, the reality that disciplinary boards, composed of correctional officials, may be overly inclined to accept the word of prison guards and refuse without reason to hear witnesses cannot be ignored. These hearings include only skeletal due process protections to begin with, which makes judicial review essential to assuring the fairness and reliability of the process as a whole. Yet because extra-record judicial review is likely to be so meaningless a protection of the constitutional right to call witnesses, the process due an inmate requires witness exclusions to be justified with contemporaneous explanations. The Court simply fails to come to grips with the issue of constitutional right posed by this case.

Established principles of procedural due process compel the conclusion that contemporaneous explanations are required for refusals of disciplinary boards to hear requested witnesses. At least in the absence of convincing considerations otherwise, that much should be clear. I turn, then, to consider whether such convincing considerations can be found.

## IV

The Court in *Wolff* identified two considerations that limit the due process rights inmates otherwise have: "institutional safety and correctional goals." 418 U. S., at 566. The proposal offered by respondent—sealed contemporaneous explanations followed by *in camera* review—would satisfy these concerns fully. At the same time, this proposal maximizes the ability of the inmate to enjoy his or her constitutional right to present defense witnesses. The proposal therefore constitutes a perfectly sensible, "reasonable accommodation" to the concerns identified in *Wolff*.

### A. *Institutional Hazards and the Threat of Reprisal*

The primary factor that caused the Court in *Wolff* to qualify and restrict the right to call witnesses was said to be "in-

stitutional safety." Fearing that inmates might be "subject to the unwritten code that exhorts immates not to inform on a fellow prisoner," *id.*, at 562, and concerned that honoring a witness request might subject the witness to "a risk of reprisal or [might] undermine authority," the Court concluded that the "hazards presented in individual cases" of "reprisal" against testifying inmates made dangerous the disclosure to a charged inmate of a board's reasons for refusing to hear his witnesses. *Id.*, at 566. Again today, the Court relies on "the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." *Ante*, at 495. Presumably, the Court's concern is that an inmate will intimidate or coerce defense witnesses into testifying falsely, and that a witness who goes to officials to disclose such threats will be the target of retaliation if a disciplinary board announces that "institutional safety" precludes it from hearing the witness.[11]

The option of sealed files, subject to later judicial review *in camera*,[12] would fully protect against the threat of reprisal and intimidation by allowing prison officials to refuse to disclose to the inmate those record statements they feared would compromise institutional safety. The *in camera* solu-

---

[11] I have stated previously my view that the Court's fears are exaggerated in this context. The prospect of intimidation and later retaliation is much more real when it comes to confrontation of adverse witnesses than "in the context of an inmate's right to call *defense* witnesses." *Wolff*, 418 U. S., at 584 (opinion of MARSHALL, J.). Indeed, the Court recognized as much in *Baxter* v. *Palmigiano*, 425 U. S. 308 (1976), observing that, "in comparison to the right to call witnesses, '[c]onfrontation and cross-examination present greater hazards to institutional interests.'" *Id.*, at 321. "Confrontation and cross-examination . . . stand on a different footing [than the right to call witnesses] because of their inherent danger and the availability of adequate bases of decision without them." *Id.*, at 322.

[12] As the Court's *in camera* discussion acknowledges, *ante*, at 499, following inspection *in camera* of the relevant statements a court might, under some circumstances, conclude that no basis existed for failing to disclose the statements to the inmate.

tion has been widely recognized as the appropriate response to a variety of analogous disclosure clashes involving individual rights and government secrecy needs. For example, after this Court in *McCray* v. *Illinois*, 386 U. S. 300 (1967), held that the identity of informants relied on by the police need not always be disclosed to the defense at suppression hearings, lower courts turned to *in camera* hearings to "protect the interests of both the government and the defendant." W. LaFave, Search and Seizure § 3.3, p. 583 (1978). Through such hearings into informant identity, "the government can be protected from any significant, unnecessary impairment of secrecy, yet the defendant can be saved from what could be serious police misconduct." *United States* v. *Moore*, 522 F. 2d 1068, 1073 (CA9 1975).[13] Similarly, Congress specifically invoked *in camera* review to balance the policies of disclosure and confidentiality contained in the exemptions to the Freedom of Information Act. 5 U. S. C. § 552(a)(4)(B). Congress stated that *in camera* review would "plainly be [the] necessary and appropriate" means in many circumstances to assure that the proper balance between secrecy and disclosure is struck. S. Rep. No. 93–1200, p. 9 (1974). Other examples in which Congress has turned to similar procedures abound, such as the federal wiretapping statute[14] and the Foreign Intelligence Surveillance Act of 1978,[15] both of which rely on closed judicial process to balance individual rights and Government secrecy needs in determining whether wiretapping is justified.

If the compelling Government secrecy needs in all these settings can be safeguarded fully through closed judicial proc-

---

[13] See also *United States* v. *Alexander*, 559 F. 2d 1339, 1340 (CA5 1977) ("[I]n camera hearing may be helpful in balancing those interests"); *United States* v. *Anderson*, 509 F. 2d 724 (CA9 1974); *United States* v. *Hurse*, 453 F. 2d 128 (CA8 1971); *United States* v. *Jackson*, 384 F. 2d 825 (CA3 1967); *People* v. *Darden*, 34 N. Y. 2d 177, 313 N. E. 2d 49 (1974).

[14] See 18 U. S. C. § 2518.

[15] 50 U. S. C. § 1801 *et seq.*

ess, it can hardly be gainsaid that the interest of prison officials in keeping confidential the basis for refusing to hear witnesses will be fully protected by the same process.   Indeed, the *in camera* solution protects the institutional concerns with which the Court purports to be concerned just as well as does the Court's solution.   Under the Court's approach, "prison officials at some point [must] state their reason for refusing to call witnesses . . . ." *Ante*, at 492.   But if institutional safety or reprisal threats formed the basis for the refusal, stating that reason[16] in open court would create hazards similar to those the Court relies on to eschew a requirement that these reasons be disclosed at the disciplinary hearing.   Recognizing this fact, the Court holds that, "if prison security or similar paramount interests appear to require it," *ante*, at 499, the courtroom justifications for refusing to hear a witness can "in the first instance," *ibid.*, be presented *in camera*.[17]   Yet once the Court acknowledges that *in camera* review adequately protects the "institutional safety" concerns discussed in *Wolff*, such concerns simply evaporate in the consideration of whether due process demands a contemporaneous-record explanation for the refusal to hear witnesses.   As even the Court acknowledges, then, the combination of sealed files and *in camera* review more than adequately protects "institutional safety," the primary factor that justified *Wolff*'s qualification of the inmate's right to present defense witnesses.

## B. *Other Correctional Goals*

To restrict the right to call witnesses, the Court in *Wolff* also relied, although less centrally, on vaguely defined "cor-

---

[16] The Court does not state whether the bare recitation of "institutional safety" is sufficient to withstand review, or whether some explanation supporting this assertion must be provided.   I too see no need to decide that question today.

[17] I would not decide today whether defense counsel has a right to be present at the *in camera* proceedings.   Cf. *United States* v. *Anderson*, 509 F. 2d 724 (CA9 1974).

rectional goals" that seemed to amount to the need for "swift punishment." 418 U. S., at 566. Again today, the Court invokes the "need to provide swift discipline in individual cases," *ante*, at 495, as a basis for refusing to require that prison officials provide a record statement of reasons for declining to hear requested witnesses.

These statements provide unconvincing support for refusing to require a written explanation when witness requests are denied. If swift discipline is a legitimate overriding concern, then why hold hearings at all? And if the imperatives of swift discipline preclude the calling of witnesses in any particular case, stating that reason would suffice.

More generally, the twinkling of an eye that it would take for a board to offer brief, contemporaneous reasons for refusing to hear witnesses would hardly interfere with any valid correctional goals. Indeed, the requirement of stated reasons for witness denials would be particularly easy to comply with at disciplinary hearings, for *Wolff* already requires provision of a "'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." 418 U. S., at 564 (citation omitted). To include in this statement a brief explanation of the reason for refusing to hear a witness, such as why proffered testimony is "irrelevant" or "cumulative," could not credibly be said to burden disciplinary boards in any meaningful way in their task of completing disciplinary report forms.

I have expressed previously my view that:

"[I]t is not burdensome to give reasons when reasons exist. . . .

". . . As long as the government has a good reason for its actions it need not fear disclosure. It is only where the government acts improperly that procedural due process is truly burdensome. And that is precisely when it is most necessary." *Board of Regents* v. *Roth,* 408 U. S. 564, 591 (1972) (dissenting).

If ever that view is true, it is surely true here. See also *Hewitt* v. *Helms*, 459 U. S. 460, 495 (1983) (STEVENS, J., dis-

senting) ("[A] requirement of written reasons [for keeping inmates in segregation] would [not] impose an undue burden on prison officials").

Ironically, the Court's shortsighted approach will likely do more to undermine other "correctional goals" with which the Court purports to be concerned than would respondent's approach. According to the Court, prison officials must come to court, many months or years after a disciplinary hearing, to "state their reason for refusing to call witnesses . . . ." *Ante*, at 492. The burdens of discovery and cross-examination could well be part of that litigation process.[18] In contrast, under respondent's approach, once a contemporaneous record was prepared, judicial review would normally be limited to review of that record. Cf. *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196 (1947). Thus, whatever the proper bearing of other "correctional goals" on the inmate's constitutional right to call witnesses, reliance on those goals to hold that prison officials must explain their refusal to hear witnesses in court, rather than in the record, is simply misplaced.

## V

In the end, the Court's decision rests more on abstract generalities about the demands of "institutional safety and other correctional goals" rather than on any attempt to come to grips with the specific mechanics of the way in which the principle established below would operate. Yet even these abstract generalities founder on the concrete practical experience of those charged with the continuing implementation of *Wolff*. The requirement the Court declines to adopt today is the prevailing practice in federal prisons and in state prisons throughout the country. Regulations promulgated

---

[18] See, *e. g.*, *Woods* v. *Marks*, 742 F. 2d 770 (CA3 1984) (summary judgment against inmate inappropriate when based on affidavit offering reason for excluding witness).

by the Federal Bureau of Prisons provide that an inmate in federal prison has

> "the right to submit names of requested witnesses and have them called to testify . . . provided the calling of witnesses . . . does not jeopardize or threaten institutional or an individual's security. . . . *The chairman shall document reasons for declining to call requested witnesses in the [Institutional Disciplinary Committee] report.*"  28 CFR § 541.17 (c) (1984) (emphasis added).

Similarly, at least 29 States and the District of Columbia require their disciplinary boards to provide a record statement of reasons for the refusal to hear requested witnesses.[19]

---

[19] Alaska Dept. of Corrections, 22 AAC05.430.(c) Completion Instructions § 20 (1984); Ala. Dept. of Corrections, Admin. Regulation No. 403, Part IV 10(g) (1983); Ark. Dept. of Correction, Disciplinary Policy and Procedures ¶ V(C)(2) (1983); Cal. Penal Code Ann. § 2932(a)(3) (West 1985); Colo. Dept. of Corrections, Code of Penal Discipline ¶ 7e(3), p. 27 (1981); D. C. Dept. of Corrections, Lorton Regulations Approval Act of 1982, § 110.2, p. 16 (1982); Fla. Dept. of Corrections, Rules ¶ 33–22.07(5) (1984); Ga. Dept. of Offender Rehabilitation, State-Wide Disciplinary Plan ¶ 6(c) (1985), and Ga. State Prison, Discipline Procedure ¶¶ 8(c), 14 (1983); Haw. Dept of Social Services & Housing, Corrections Div., Inmate Handbook § 17–201–17(e)(3) (1983) (Board "encouraged" to give written reasons); Ill. Dept. of Corrections, Rules, § 504.80(i)(3) (1984); Ind. Dept. of Corrections, Policies and Procedures, State Form 39586R, Completion Form § 20; Iowa Dept. of Corrections, Inmate Activity, Disciplinary Policy and Procedure §§ II (Procedure) (D)(3), II (Procedure) (E)(5) (1984); Kan. Admin. Reg. § 44–13–405a(g) (Supp. 1984); Ky. Corrections Cabinet, Policy No. 15.6, ¶ VI(E)(1)(e) (1985); Md. Dept. of Public Safety and Correctional Services, Division of Correction, Regulation No. 105–2, § IV–B(2)(b) (1982); Mich. Dept. of Corrections, Hearings Handbook § II–B(3), p. 4 (1981); Miss. Dept. of Corrections, Rules and Regulations § XII(D)(1), p. 11 (1975); Mont. Dept. of Institutions, Inmate Disciplinary Procedures, Conduct of Hearing § 2–PD85–216, pp. 10–11 (1985); Neb. Dept. of Correctional Services, Rule 6(6)(e), p. 6–3 (1984); N. H. State Prison, Major Disciplinary Hearing Procedures ¶ 6 (1978), and Added Instructions for Handling Inmate Witness Requests ¶ 2(C); N. J. Dept. of Corrections, Disciplinary Standard 254.18 (1984); N. M. Penitentiary, Policy No. PNM 090301,

In addition, the practice of preparing contemporaneous explanations for the refusal to hear witnesses is favored by experts who have devoted substantial time and resources to studying the problem and who know quite well what the needs of institutional safety are in this context. For example, the American Correctional Association (ACA), after a study funded by the Department of Justice, has adopted the following standard as an "essential" element of disciplinary-hearing procedures:

> "Written policy and procedure provide that the inmate is given an opportunity to make a statement and present documentary evidence, and may request witnesses on his/her behalf; *reasons for the denial of such a request are stated in writing*" (emphasis added). ACA Standards for Adult Correctional Institutions, Standard 2–4363 (2d ed. 1981).

Similarly, the National Conference of Commissioners on Uniform State Laws (NCUSL) has determined that whenever an inmate's request for a witness is denied, the hearing officer must make "a written factual finding that to [call the witness] would subject a person to a substantial risk of physical harm." NCUSL, Model Sentencing and Correction Act § 4–507 (1979). A third study of this problem reached the same conclusion: "Reasons for disallowing prisoners' requests

---

¶ II(C)(8) (1983); N. Y. Dept. of Correctional Services, Rules and Regulations § 253.5(a) (1983); N. C. Dept. of Correction, Policies and Procedures § .0201(c)(4) (1984); Okla. Bd. of Corrections, Policy Statement No. OP–060401, ¶ 2(C)(1)(c) (1985); Ore. Dept. of Human Resources Corrections Division, Rule Governing Inmate Prohibited Conduct, and Procedures for Processing Disciplinary Actions §§ VI(G)(4)(a) and VI(G)(6)(d) (1982); Tenn. Dept. of Correction, Administrative Policies and Procedures, Index No. 502.01, ¶ VI(D)(2)(d) (Dec. 1981); Tex. Dept. of Corrections, Disciplinary Rules and Procedures § V(B)(4) (1984); Utah State Prison, Disciplinary Procedures ¶ III(D)(2)(g) (1984); Wis. Admin. Code, note following § HHS 303.81 (1985).

Some of these States explicitly require that the record be disclosed to the inmate; in other States, it is unclear whether the inmate is entitled to view the statements or how judicial review of these explanations is carried out.

for appearance of witnesses should be recorded for purposes of future review." ABA Standards for Criminal Justice 23–3.2, p. 23·41, n. 14 (2d ed. 1980) (as added 1983).

These authorities testify to the fact that, as penological experts have implemented *Wolff* over the last 11 years, significantly more has been learned about the sorts of due process protections at disciplinary hearings that are compatible with institutional needs. Recognizing that it was taking a tentative first step in this area, the Court in *Wolff* acknowledged that events in future years might "require further consideration and reflection of this Court." 418 U. S., at 572. At the time of *Wolff*, the only option considered by both the majority and dissenting opinions was whether disciplinary boards ought to be required to "state" their reasons for refusing to hear requested witnesses, see *id.*, at 584 (opinion of MARSHALL, J.); *id.*, at 597–598 (opinion of Douglas, J.); this option seemingly implied disclosure to the inmate. But neither the Court nor the dissenting opinions considered the middle-ground alternative respondent proposes today: that a contemporaneous record be prepared and preserved in case of later legal challenge but not be available to the inmate. The failure to consider this alternative is not surprising, for at the time of *Wolff* the relevant question was simply whether inmates had any right at all to present witnesses; no federal court had yet considered whether reasons had to be given for denying this right, let alone whether such reasons could be recorded but preserved in a file to which the inmate would not have access. *Id.*, at 572, n. 20.[20] Nor was the process of *in camera* review, upon which respondent's alternative depends, as common a solution to clashes between individual rights and government secrecy needs as it is today. Yet despite these developments, and despite *Wolff*'s expectation that future developments would make clearer the proper balance between due process and institutional concerns, the

---

[20] Neither the parties nor any of the many *amici curiae* offered such a suggestion in the voluminous briefs filed in the case. See briefs in *Wolff* v. *McDonnell*, O. T. 1973, No. 73–679.

Court today inexplicably ignores the evolution of legal approaches and penological policy in this area.[21]

## VI

The Court's decision leaves the inmate's constitutional right to present defense witnesses dangling in the wind.

---

[21] No doubt the Court's sparse reasoning in this case and the utter lack of empirical foundation for its bald assertions is in part a product of the fact that *not a single lower court, state or federal,* appears to have considered the alternative of sealed records and *in camera* review that the Court today forecloses. This Court is often called on to strike difficult balances between individual rights and institutional needs, but by precipitately rushing into voids left by lower courts, the Court decreases the likelihood that the balance at which it arrives will properly account for all the relevant interests and available options. In this case, the State simply cried *Wolff,* and, despite the absence of any clear conflict, the Court responded. But hastily granting certiorari every time an inmate or criminal defendant prevails below, as the current Court seems wont to do, deprives us of the insight lower court judges could offer on the issues and of the experiential basis that implementation of lower court decisions provides. The result, often as not, is the sort of decision rendered today. Once again, "[p]remature resolution of the novel question presented has stunted the natural growth and refinement of alternative principles." *California* v. *Carney,* *ante,* at 399 (STEVENS, J., dissenting).

In light of current discussion over the Court's workload, it is worth noting further that, in the absence of any conflict in the lower courts, the decision to grant certiorari in this case is virtually unfathomable. At most, a state court had imposed more stringent due process requirements on its own institutions than this Court had previously recognized. I continue to believe the justifications for review in this Court are at their weakest in such cases, where no individual rights are alleged to be violated and where a state court speaks to its own institutions. See, *e. g., Oregon* v. *Hass,* 420 U. S. 714, 726 (1975) (MARSHALL, J., dissenting); see also *Michigan* v. *Long,* 463 U. S. 1032, 1065 (1983) (STEVENS, J., dissenting); see generally Developments in the Law, 95 Harv. L. Rev., 1342–1347 (1982). This case should therefore be added to the mounting list of examples that disprove claims that the Court is overburdened; "[m]uch of the Court's 'burdensome' workload is a product of its own aggressiveness" in rushing headlong to grant, often prematurely, the overstated petitions of State

Perhaps that is the virtue to the Court of its decision, for I certainly can discern no other basis, grounded in principle or sound reasoning, for it. *Wolff* may give prison officials a privilege to dispense with certain due process rights, but, as always, "[t]he scope of a privilege is limited by its underlying purpose." *Roviaro* v. *United States*, 353 U. S. 53, 60 (1957). The underlying purposes of the privilege recognized in *Wolff*—the promotion of "institutional safety and correctional goals"—can be realized fully by contemporaneous explanations not disclosed to the inmate. For that reason, the privilege recognized in *Wolff* ought to evaporate in the face of this means of accommodating the inmate's due process rights. That is the conclusion of penological officials and experts throughout the country and my conclusion as well. The Court, however, concludes otherwise. I therefore dissent.

---

Attorneys General distraught with the performance of their own state institutions. *Carney, ante,* at 396 (STEVENS, J., dissenting). Reserving the argument docket for cases of truly national import would go far toward alleviating any workload problems allegedly facing the Court.